UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD APPEL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BOSTON NATIONAL TITLE AGENCY, LLC, <br><br> Defendant. | Case No.: 3:18-CV-0873-RSH-AHG <br><br> **RULING AND ORDER ON APPLICABILITY OF BIDDER REGISTRATION AGREEMENT'S RELEASE PROVISION TO PLAINTIFFS' CLAIMS** <br><br> **[ECF Nos. 162, 164, 166]** |

## I. Introduction

At the hearing and pretrial conference on October 27, 2021, Plaintiffs Howard Appel, David Cohen, and Ke'e Partners, LLC ("Ke'e") and Defendant Boston National Title Agency, LLC ("Boston National") (collectively, the "Parties") agreed to bifurcate the proceedings, allowing the Court to determine certain legal issues (Phase I) in advance of a jury trial (Phase II). *See* ECF No. 161 (Tr. of Proceedings on Nov. 30, 2011) at 9-12. Pursuant to that agreement, the parties submitted written briefing. ECF Nos. 162, 164, 166. Although there are numerous legal issues in the case, the Parties' briefing focused on one issue in particular: Whether the release provision in the Bidder Agreement bars Plaintiffs'

claims in this case.[1] The Court thereafter heard argument on March 10, 2022. *See* ECF No. 178 (Tr. of Proceedings on Mar. 10, 2022). The hearing was not an evidentiary hearing involving witness testimony or the introduction of exhibits, but instead was akin to argument on a motion. *Id.*

This case was transferred to the undersigned on June 24, 2022. ECF No. 178. The undersigned has reviewed the relevant briefing as well as the transcripts of oral argument, and is able to issue this Phase I Ruling without further argument. As explained further below, the Court determines that the release in the Bidder Agreement does not bar any of Plaintiffs' claims from being presented to a jury in Phase II.

## II.    Background

The factual background and procedural history of this case were set forth in detail the Court's prior order on Boston National's motion for summary judgment. ECF No. 151 at 2-6 (Order dated Sept. 17, 2021). The current question focuses on the Bidder Registration Agreement ("Bidder Agreement") between Appel and non-party Concierge Auctions, LLC ("Concierge"), that Appel signed on June 20, 2017.[2] The prefatory language to the Bidder Agreement explained:

> Concierge . . . will present the Properties for sale by auction (the "Auction") on behalf of the seller of each Property (each, a "Seller"). Prospective purchasers who register in according with these Terms & Conditions will be deemed "Bidders" at the Auction. These Auction Terms & Conditions constitute Concierge's and each Seller's entire agreement with the Bidders relative to the Property(s) presented in the Auction. . . . By participating in the Auction, you acknowledge and agree that you are bound by these Auction Terms & Conditions . . . .

---

[1]    Defendant's briefing also continued to contest whether Plaintiffs have standing to sue.

[2]    The Bidder Agreement can be found on the Court's docket at ECF No. 42-4 at pp. 93-104.

ECF No. 42-4 (Bidder Agreement at Preface). The agreement required the bidder to make a $100,000 deposit, followed by (in the event the bidder was the high bidder) a 12% earnest money deposit, due no later than July 3, 2017. *Id.*

Boston National was not a party to the Bidder Agreement, although the agreement provided that "[e]scrow services shall be provided exclusively by Boston National Title ('Escrow Agent')." *Id.* at ¶ 8. The Bidder Agreement also mentioned Boston National by providing that Concierge's fee for any purchase "shall be held by Boston National and disbursed by Concierge to Boston National upon closing." *Id.* at ¶ 3.

The Bidder Agreement contained a release provision ("Release"). The Release provided that (1) "each prospective bidder and any anyone claiming by, through or under the same," (2) "release seller and Concierge, and their respective affiliates, employees, officers, directors, representations, attorneys and agents," (3) "from any and all claims that [they] may now have or hereafter acquire" against the same, (4) "arising from or relating to the conduct of the auction." *Id.* at ¶ 12.[3]

---

[3]   The Release provides, in relevant part:

EACH PROSPECTIVE BIDDER AND ANYONE CLAIMING BY, THROUGH OR UNDER THE SAME HEREBY FULLY AND IRREVOCABLY RELEASE SELLER AND CONCIERGE, AND THEIR RESPECTIVE AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS, FROM ANY AND ALL CLAIMS THAT HE/SHE/IT OR THEY MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SELLERS AND/OR CONCIERGE, AND/OR THEIR RESPECTIVE AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS, FOR ANY COST, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATING TO THE CONDUCT OF THE AUCTION AND/OR THE CONDITION OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO ANY CONSTRUCTION DEFECTS, ERRORS, OMISSIONS OR OTHER CONDITIONS, INCLUDING BUT NOT LIMITED TO ENVIRONMENTAL MATTERS, AFFECTING THE PROPERTY, OR

Neither Ke'e nor Cohen were signatories to the Bidder Agreement.

Pursuant to the Bidder Agreement, on June 21, 2017, Ke'e deposited $100,000 with Boston National on behalf of Plaintiffs. ECF No. 144 (Joint Statement of Undisputed Material Fact) at 2. On July 3, 2017, Appel deposited an additional $185,000 with Boston National on behalf of Plaintiffs. *Id.* at 3. Thereafter (in short), a dispute arose between Plaintiffs and Boston National; Plaintiffs demanded their money back; Plaintiffs sued Concierge; Plaintiffs filed this lawsuit against Boston National; and Boston National ultimately returned $285,000 on May 24, 2018—approximately eleven months after it had been sent. *Id.*

Plaintiffs' operative Third Amended Complaint ("TAC") brings nine claims against Boston National: (1) breach of fiduciary duty, (2) negligence, (3) accounting, (4) violation of California's Unfair Competition Law, (5) fraudulent concealment, (6) fraudulent misrepresentation, (7) negligent misrepresentation, (8) violation of California's False Advertising Law, and (9) conversion. ECF No. 99. Each of the claims in the TAC pertains

---

> ANY PORTION THEREOF. THIS RELEASE INCLUDES CLAIMS OF WHICH PROSPECTIVE BIDDER IS PRESENTLY UNAWARE OR DOES NOT PRESENTLY SUSPECT TO EXIST IN HIS/HER/ITS FAVOR WHICH, IF KNOWN BY PROSPECTIVE BIDDER, WOULD MATERIALLY AFFECT PROSPECTIVE BIDDER'S RELEASE OF SELLERS AND CONCIERGE. EACH PROSPECTIVE BIDDER SHOULD CONSIDER THESE MATTERS WHEN REGISTERING AS A BIDDER AND BEFORE PLACING BIDS.
>
> BIDDER ACKNOWLEDGES THAT THIS RELEASE AND DISCLAIMER IS INTENDED TO BE VERY BROAD AND BIDDER EXPRESSLY WAIVES AND RELINQUISHES ANY RIGHTS OR BENEFITS IT MAY HAVE UNDER ANY STATE OR FEDERAL LAW OR LEGAL PRINCIPLE DESIGNED TO INVALIDATE RELEASES OF UNKNOWN OR UNSUSPECTED CLAIMS TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW.

1 to harm that Plaintiffs allegedly suffered by paying the $285,000 over June and July 2017,
2 and/or not receiving the money back until May 2018.

3 The Court granted a motion to dismiss the TAC in part. ECF No. 106 (Order dated
4 June 6, 2020). This order narrowed the scope of certain claims but did not dismiss any in
5 their entirety. Thereafter, the Court granted summary judgment to Boston National on
6 Plaintiffs' fifth claim (for fraudulent concealment) and granted summary adjudication as
7 to Plaintiffs' request for punitive damages. ECF No. 151 (Order dated Sept. 17, 2021).

8 **III.    Subject Matter Jurisdiction**

9 This action is premised on diversity jurisdiction under 28 U.S.C. § 1332. *See* ECF
10 No. 99 (TAC) at p. 4. The operative complaint alleges that "complete diversity of
11 citizenship exists in that the parties are citizens of different states, and the matter in
12 controversy exceeds the sum or value of $75,000, exclusive of interest and costs." *Id.*[4] At
13 the request of the Court, the Parties submitted supplemental briefing on the issue of the
14 amount in controversy in this case. *See* ECF Nos. 175, 176, 177.

15 "[D]iversity jurisdiction is determined at the time the action commences, and a
16 federal court is not divested of jurisdiction if . . . the amount in controversy subsequently
17 drops below the minimum jurisdictional level." *Hill v. Blind Indus. & Servs. of Md.*, 179
18 F.3d 754, 757 (9th Cir.), *amended on denial of reh'g*, 201 F.3d 1186 (9th Cir. 1999)
19 (internal citations omitted); *see Maine Cmty. Health Options v. Albertsons Cos.*, 993 F.3d
20 720, 723 n.2 (9th Cir. 2021) ("[I]t is well settled that the jurisdictional amount is established
21 'from the face of the pleadings,' . . . 'at the time a complaint is filed.'") (citations omitted).
22 Boston National agrees that Plaintiffs' allegations of damages "satisfies the monetary
23 aspect of diversity jurisdiction, which is measured at the onset of a case." ECF No. 176 at

---

[4] The TAC also alleges supplemental jurisdiction under 28 U.S.C. § 1367, on the grounds that the state law claims in these case "are so related to the federal law claims that they form part of the same case or controversy." There are no federal law claims in the TAC, however.

2. There is no dispute here that at the time the case was filed, Boston National had not yet returned to Plaintiffs the $285,000 that is at the center of this lawsuit. The amount in controversy requirement is therefore satisfied.[5]

Boston National continues to argue in its briefing that each of the Plaintiffs in this case lack standing, another element of subject matter jurisdiction. To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by a favorable judicial decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Where there are multiple plaintiffs in a case, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017).

The need to satisfy the standing requirements "persists throughout the life of the lawsuit." *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016). Each element of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the trial stage, the factual allegations

---

[5] At the hearing on March 10, 2022, Plaintiffs argued that in addition to the $285,000 that was sent to Boston National and thereafter returned, the amount in controversy also includes approximately $180,000 in attorneys' fees and costs that were spent between July 3, 2017 and May 24, 2018 in order to recover the funds, including by suing Concierge and then by suing Boston National. ECF No. 172 at 10-15. Plaintiffs contend that these are recoverable as damages for conversion. *Id.* at 11. Not so.

California Civil Code section 3336 provides that damages for conversion are presumed to include, in addition to the value of the property at the time of conversion plus interest, "[a] fair compensation for the time and money properly expended in pursuit if the property." However, the law is clear that attorneys' fees are not recoverable under this theory. "It has long been held that such fees are not within the rule of damages provided for by [section 3336]." *Haines v. Parra*, 193 Cal. App. 3d 1553, 1559 (Cal. Ct. App. 1987) (quoting *Russell v. United Pac. Co.*, 214 Cal. App. 2d 78, 91 (Cal. Ct. App. 1963)). "Expenses 'incurred in preparation for litigation and not in pursuit of property' cannot be allowed as damages under Civil Code section 3336." *Id.* (quoting *Sec.-First Nat. Bank of Los Angeles v. Lutz*, 322 F.2d 348, 352 (9th Cir. 1963)).

that are necessary to support standing "must be 'supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979)).

Boston National previously moved to dismiss the case for lack of standing, arguing that Plaintiffs "cannot establish an injury in fact caused by [Boston National]." ECF No. 126-1 at 8. This Court denied the motion, ruling that Plaintiffs had properly pleaded standing. ECF No. 151 at 6-7. Additionally, Boston National previously conceded in connection with the summary judgment briefing that the $285,000 that was sent to Boston National was "deposited . . . on behalf of Plaintiffs," ECF No. 144 (Joint Statement of Undisputed Material Facts) at 3; a failure to timely return that money to Plaintiffs, if such a return were required by law, would seemingly constitute an injury redressable by a judicial decision. Of course, Plaintiffs will be required to appropriately establish standing at trial based on the evidence presented at trial, and Boston National will have the opportunity to again argue lack of standing.

**IV.   The Applicability of the Release in the Bidder Agreement**

   **A.   Overview**

The question whether the Release in the Bidder Agreement bars Plaintiffs claims involves a number of subsidiary questions, including: (1) Was Boston National an "agent" of Concierge or the seller, or both or neither? (2) Do Plaintiffs' claims "aris[e] from or relat[e] to the conduct of the auction" contemplated by the Bidder Agreement? (3) Can Boston National enforce the Bidder Agreement as a third-party beneficiary? (4) Can Boston National enforce the Bidder Agreement against Plaintiffs Cohen and Ke'e, who were not signatories? and (5) Is the Release valid as applied to Plaintiffs' claims? The Parties' briefing focused mostly on the first two of these questions.

There is some overlap between the questions above and questions of fact that are typically decided at trial—for example, the existence, scope, and timing of an agency relationship. *See Spencer S. Busby, APLC v. BACTES Imaging Solutions, LLC*, 74 Cal. App. 5th 71, 82 (Cal. Ct. App. 2022) ("The existence of an agency relationship is a factual

question for the trier of fact . . . .") (citation omitted). Despite the Parties' description of their briefing as "Phase I Trial Briefs," there has been no trial yet. No witnesses have testified and no evidence has been received. The purpose of this Phase I Ruling is to address legal issues in advance of the jury trial, and the Court is not in a position to resolve disputed facts in this Ruling.

With regard to the fifth question above, the Court determines that California law prevents the Release in the Bidder Agreement from barring Plaintiffs' claims. That is, even if Boston National is able enforce the Bidder Agreement against Plaintiffs generally, and even if Plaintiffs' claims fall within the scope of the Release contained in the Bidder Agreement, Boston National cannot invoke the Release to prevent Plaintiffs' claims from being presented to a jury.

### B.   Choice of Law

The Bidder Agreement contains a New York choice-of-law clause.[6] In their extensive briefing on the Release issue, the Parties have principally cited and relied on California law, and neither has argued that New York law applies rather than California law.[7] Even so, the Court briefly addresses the choice-of-law clause.

A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002 (9th Cir. 2010). "California courts apply the parties' choice of law unless the analytical approach articulated in § 187(2) of the Restatement (Second) of Conflict of Laws dictates a different result." *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (citation omitted). The California Supreme Court has described that approach as follows:

---

[6]   The clause provides: "The respective rights and obligations of the parties with respect to these Auction Terms & Conditions and the conduct of the Auction shall be governed, enforced, and interpreted by the laws of the state of New York, without regard for conflicts of law principles." ECF No. 42-4 at 100.

[7]   Boston National has taken the position in a footnote that the Release is valid under both California and New York law. ECF No. 162 at 13 n.11.

> Briefly restated, the proper approach under Restatement section 187, subdivision (2) is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a "materially greater interest than the chosen state in the determination of the particular issue . . . ." (Rest., § 187, subd. (2).) If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy.

*Nedlloyd Lines B.V. v. Super. Court*, 3 Cal. 4th 459, 466 (Cal. 1992).

Here, it bears noting that the New York choice-of-law clause, although presumptively the choice of the parties to the Bidder Agreement, was hardly the choice of the parties who are now litigating the applicability of that agreement. Of the four parties to this lawsuit, only one (Appel) was a signatory to the Bidding Agreement, which was presented to him by Concierge. It is therefore unsurprising that none of the parties to this lawsuit has any substantial connection to New York. Plaintiffs Appel and Cohen reside in California. Plaintiff Ke'e is a Delaware limited liability company, and its sole member is another Delaware limited liability company. Defendant Boston National is a Florida limited liability company, and its sole member is a Delaware limited liability company.[8] There is no evidence that the transaction at issue had a connection to New York, substantial or otherwise. Nor does there appear any other reasonable basis for applying New York law. The TAC alleges events that took place in California but does not allege any events

---

[8] The TAC alleges that Boston National's sole member is a holding company, one of whose members is a citizen of New York. ECF No. 99 at p. 5-6. Boston National's Answer denies this. ECF No. 108 at p. 4.

9

involving Plaintiffs and Boston National that took place in New York.[9] The Court therefore applies California law.

### C. Validity of Release

California law limits the ability of parties to release future torts. Civil Code section 1668 provides in full:

> All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.

This statute reflects California's policy of looking "with disfavor upon those who attempt to contract away their legal liability to others for the commission of torts." *Blankenheim v. E.F. Hutton & Co.*, 217 Cal. App. 3d 1463, 1471 (Cal. Ct. App. 1990).

Section 1668 "does not negate such a clause when all the elements are past events." *SI 59 LLC v. Variel Warner Ventures, LLC*, 29 Cal. App. 5th 146, 148 (Cal. Ct. App. 2018). It renders contract provisions unenforceable "only when all or some of the elements of the tort are concurrent or future events at the time the contract is signed." *Id.* In short, "[t]he statute prohibits exculpation from future torts." *Id.* at 152.[10]

Generally, section 1668 prevents exemption of liability for future intentional wrongs, gross negligence, and violations of the law. *See Farnham v. Super. Ct. (Sequoia Holdings, Inc.)*, 60 Cal. App. 4th 69, 74 (Cal. Ct. App. 1997). In the case of ordinary

---

[9] In the separate lawsuit that Appel and Cohen brought against Concierge, the Court addressed the choice-of-law clause in the same Bidder Agreement and determined that California law, rather than New York law, applied. *Appel v. Concierge Auctions, LLC*, No. 3:17-cv-02263-BAS-MDD (S.D. Cal.), ECF No. 30 at 12-13 (Order Granting in Part Motion to Compel Arbitration).

[10] Section 1668 also prevents release of liability for fraudulent inducement of the contract containing the release. *Variel Warner*, 29 Cal. App. 5th at 152. Here, Plaintiffs allege that they were fraudulently induced to enter into the Bidder Agreement. ECF No. 99 at p. 7.

negligence, section 1668 does not prohibit a contractual release of future liability unless the "public interest" is involved or unless a statute expressly prohibits it. *Id.*

Here, the claims in the TAC are based, at least in part, on events occurring *after* the signing of the Bidder Agreement on June 20, 2017. Each of those claims pertains to harm that Plaintiffs allegedly suffered by paying the $285,000 after signing the agreement (with $100,000 paid on June 21, 2017, and $185,000 paid on July 3, 2017), and/or not receiving the money back until May 2018. For none of those claims was the tort allegedly complete before Plaintiffs signed the Bidder Agreement. The TAC alleges that "[b]eginning or before June 5, 2017," Plaintiff Appel reviewed Boston National's website, and observed that it contained misrepresentations that Boston National was licensed to provide services in California. ECF 99 at p. 6. This means that Appel reviewed the alleged misrepresentations at least 15 days before signing the Bidder Agreement. However, even those claims that rest on the falsity of such representations include elements that occurred after signing the Bidder Agreement. Thus, Plaintiffs' claims for violation of the Unfair Competition Law and the False Advertising Law each allege that Plaintiffs relied on Boston National's misrepresentations when Plaintiffs deposited money with Boston National. *Id.* at pp. 15, 21. Plaintiffs' claim for fraudulent misrepresentation, although less specific about when the reliance occurred, alleges that the harm to Plaintiffs occurred when they were deprived of their right to exercise control over the funds they had deposited with Boston National. *Id.* at p. 19. For purposes of determining whether section 1668 applies to the Release, Plaintiffs' claims are therefore "future torts."

Plaintiffs' claims also fall within the *type* of future wrongs implicated by section 1668. Plaintiffs' claim for fraudulent misrepresentation falls within the plain language of section 1668, which refers to "fraud"; similarly, Plaintiffs' claims under the Unfair Competition Law and the False Advertising Law fall within the reference of section 1668 to "violation[s] of law." Plaintiffs' claim for negligent misrepresentation likewise falls within section 1668. *See McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 794 (Cal. Ct. App. 2008) (stating that section 1668 "encompasses intentional and negligent

misrepresentation"). Additionally, "a breach of fiduciary duty constitutes a 'willful injury to the . . . property of another' under Civil Code section 1668 and therefore cannot be contractually excused." *Neubauer v. Goldfarb*, 108 Cal. App. 4th 47, 56 (Cal. Ct. App. 2003).

This leaves Plaintiffs' claims for ordinary negligence, conversion, and accounting.

### 1. *Negligence*

"Despite its prohibition of an exemption from liability for future acts of 'negligence,' section 1668 does not *per se* prohibit a contractual release of future liability for ordinary negligence unless the 'public interest' is involved or unless a statute expressly forbids it." *Farnham*, 60 Cal. App. 4th at 74. The California Supreme Court set forth in *Tunkl v. Regents of University of California*, 60 Cal. 2d 92, 98-101 (Cal. 1963), factors courts have considered in determining whether a contract involves the "public interest":

> In placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough outline of that type of transaction in which exculpatory provisions will be held invalid. Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

Applying these six factors, the California Court of Appeal held that an exculpatory clause did not relieve an escrow company for liability for ordinary negligence in a case brought by a seller of commercial real estate. *Akin v. Bus. Title Corp.*, 264 Cal. App. 2d 153, 156-59 (Cal. Ct. App. 1968). The court determined that all of the factors favored treating the transaction as one that affects the public interest. *Id.* at 156-57. The court noted that "[e]scrow companies . . . in the State of California, have such a pervasive effect on the economic life of our citizens that they have to some degree taken on a public character," and further observed that "[t]he factors of public interest and inequality of bargaining power are at least as prominent in the case of an escrow holder as in the case of a bank." *Id.* at 158.

*Akin* controls here. (1) Here, the transaction concerns a type of business—an escrow company—that is subject to regulation by the State of California. (2) *Akin* recognized that escrow companies perform important public services, which are often a matter of practical necessity for some members of the public. *Id.* at 157. (3) As alleged in the TAC and as reflected in the web pages cited therein, Boston National holds itself out as willing to perform its services for the general public. *See* ECF No. 99 at p. 6. (4) Also as *Akin* recognized, "[t]he escrow company possesses a decisive advantage of bargaining strength against a member of the public who seeks its services." 264 Cal. App. 2d at 157. In this case, there is no dispute that the Bidder Agreement designated Boston National as the exclusive escrow agent of the auction. *See* ECF No. 42-4 at 97; ECF No. 162 at 9. (5) Further, Plaintiffs were faced with what appeared to be a standardized agreement, albeit one provided by Concierge rather than Boston National, apparently with no opportunity in that agreement to obtain protection against negligence. (6) As a result of the transaction, Plaintiffs' funds were placed under the control of Boston National, the very subject of this lawsuit.

The most prominent disanalogy between this case and *Akin* is that here, the agreement containing the exculpatory clause was provided by Concierge (the auction company), rather than by Boston National (the escrow agent). This incongruity, however,

is a function of the fact that Boston National is trying to invoke the release of claims contained in an agreement to which it was not a party. But if Boston National cannot contract away its own liability for negligence, neither can it rely on another party's contract for the same result.

Because the transaction here—insofar as it pertained to Boston National's provision of escrow services—involved the "public interest," section 1668 prevents the release of a future claim of ordinary negligence.

### 2. *Conversion*

There is a split of authority in California on whether conversion is an intentional tort or a strict liability tort. *Compare Multani v. Knight*, 23 Cal. App. 5th 837, 853 (2018) ("Conversion is an intentional tort.") *and Collin v. Am. Emp. Ins. Co.*, 21 Cal. App. 4th 787, 812 (Cal. Ct. App. 1994) ("[C]onversion is considered an intentional tort.") *with Los Angeles Fed. Cred. Union v. Matadyan*, 209 Cal. App. 4th 1383, 1387 (Cal. Ct. App. 2012) ("Conversion is a strict liability tort."). One California case stated in a footnote that a claim for conversion based on intentional acts would fall within section 1668's prohibition. *See Farnham*, 60 Cal. App. 4th at 77 n.6.[11] Here, the Plaintiffs have pleaded their conversion claim in terms of intentional wrongdoing by Boston National. ECF No. 99 at p. 22.

On balance, the weight of California authority favors treating Plaintiffs' conversion claim as within the scope of section 1668, whether based on treating the claim as an intentional tort, as a strict liability tort for which intentional wrongdoing is alleged, or as a strict liability tort for which the "public interest" is implicated. *See Madison v. Super. Ct.*, 203 Cal. App. 3d 589, 599 (Cal. Ct. App. 1988) ("[A]bsent a public interest involvement . . . section 1668 will not invalidate contracts which seek to exempt one from liability for

---

[11]   *But see Grayson v. 7-Eleven, Inc.*, No. 09-CV-1353-GPC-WMC, 2013 WL 1187010, at *6 (S.D. Cal. Mar. 21, 2013) (holding that Section 1668 does not invalidate a release from the strict liability tort of conversion, while noting that no California court has addressed the question).

simple negligence or strict liability."). This interpretation comports with common sense. It would be unjust and illogical to hold that a person who agrees to a broadly worded release thereby gives the other party free reign to convert (or steal) property in the future. It would be even more unjust where such a release, rather than being the subject of a negotiated settlement agreement, is simply fine print tucked away in a form contract that the first party is asked to sign as a condition of engaging in a transaction—akin to an attorney arguing that a broad prospective release contained in a retainer agreement allows the attorney to simply steal the client's money in the future.

### 3. *Accounting*

Finally, Plaintiffs' claim for an accounting is an equitable remedy, rather than a cause of action. *See Nguyen v. JP Morgan Chase Bank*, No. Bo. SACV11-01908, 2012 WL 13019941, at *4 (C.D. Cal. Apr. 16, 2012) ("Courts in California generally classify an accounting as a remedy and not a cause of action."); *see also First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1125 (9th Cir. 2000) ("The remedy sought here is an equitable one, an accounting."). This claim will not be presented to the jury; rather, the Court will rule post-trial on what equitable relief, if any, is warranted based on the facts presented at trial. Boston National may, at that time, make any appropriate argument (including based on the Release) for why such a remedy is not warranted.

## IV. Conclusion and Order

For the foregoing reasons, the Court determines that the Release in the Bidder Agreement does not bar any of Plaintiffs' claims from being presented to a jury.

As set forth in the Order transferring the case to the undersigned (ECF No. 178), all pending dates—including those set forth in the Court's Jury Trial Preparation and Scheduling Order of March 23, 2022 (ECF No. 171)—remain in place. The final pretrial conference and the jury trial will be held in Courtroom 3B (rather than Courtroom 3A), and the required submissions to chambers should use the undersigned's email address, efile_huie@casd.uscourts.gov.

On May 20, 2022, the Parties submitted by email a Proposed Pretrial Order. That proposed order—like the version previously submitted by the Parties in October 2021—fails to include a statement to be read to the jury of the nature of the case and claims and defenses, and instead includes two separate statements accompanied by argumentative prefatory material. No later than **seven (7) days** before the final pretrial conference, the Parties shall lodge with the Court a revised Proposed Pretrial Order that is consistent with this Phase I Ruling and that strictly complies with Local Rule 16.1(f)(6)(c). If the Parties fail to comply, the Court will consider the imposition of sanctions.

Except as modified by the Trial Preparation and Scheduling Order (ECF No. 171), the Parties shall in all other respects comply with the undersigned's Chambers Civil Procedures.

**IT IS SO ORDERED.**

Dated: August 19, 2022

Hon. Robert S. Huie
United States District Judge